UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN DUANE HEADLA,

                        Plaintiff,               Case No.: 11-cv-10632
                                            Honorable George Caram Steeh
        v.                          Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                        Defendant.
_____/

## REPORT AND RECOMMENDATION GRANTING COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT [10] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [7]

Plaintiff Kevin Headla ("Headla") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [7, 10] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") assessment that Headla was not disabled during the four months between September 1, 2002 (his alleged onset date) and December 31, 2002 (the date he was last insured for benefits). Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [10] be GRANTED, Headla's Motion for Summary Judgment [7] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.   REPORT

### A.   Procedural History

On January 25, 2007, Headla filed an application for DIB, alleging disability as of September 1, 2002. (Tr. 84-88).[1]  The claim was denied initially on February 13, 2007. (Tr. 42-45).  Thereafter, Headla filed a timely request for an administrative hearing, which was held on May 11, 2009 before ALJ Elliott Bunce. (Tr. 26-40).  Headla (represented by attorney Mikel Lupisella, testified, as did vocational expert ("VE") Judith Findora. (*Id.*).  On June 16, 2009, the ALJ found that Headla was not disabled. (Tr. 9-20).  On December 13, 2010, the Appeals Council denied review. (Tr. 1-3).  Headla filed for judicial review of the final decision on February 16, 2011 [1].

### B.   Background

#### 1.   *Disability Reports*

In a January 29, 2007 disability field report, Headla reported that his alleged onset date was September 1, 2002, and it was determined that his date last insured was December 31, 2002. (Tr. 95).  In a disability report filed the same day, Headla reported that the conditions preventing him from working included a "blown out disc, steel rods" and a fusion in his lower back at L4-L5.[2] (Tr. 99).  Headla reported that these conditions limited his ability to work because he was unable to stand or walk for more than an hour, sit for more than twenty minutes, and he could not bend or twist. (*Id.*).  He also reported having a weight restriction of five pounds, and that his left

---

[1] The administrative record also contains an application filed by Headla in January 2006 for Social Security Income benefits ("SSI"). (Tr. 76-81).  However, the alleged onset date contained within that application was December 1, 2005, and the application itself was neither considered by the Social Security Administration in its initial denial of this case, nor by the ALJ in his decision, nor by the Appeals Council.  Nor has Headla's counsel argued that it should have been considered.  Thus, the court will disregard it.

[2] Though Headla reported that these conditions limited his ability to work since his alleged onset date, he did not have steel rods or a fusion in his lower back until 2006. (Tr. 164).

leg tingled or went numb. (*Id.*). While Headla reported that he became unable to work due to his conditions on September 1, 2002, he also reported that he had stopped working on December 31, 1999 because he "hurt [his] back" and "couldn't do [his] job anymore." (*Id.*). He reported being treated by a number of doctors for his condition, dating back to 2000. (Tr. 101-104). He also reported having had a worker's compensation claim in 2000. (Tr. 103). Headla reported taking Flexeril and Tylox for the pain, both prescribed by Dr. Mark Adams. (Tr. 104). He reported that MRI/CT scans of his back were performed in 2001, 2003 and 2004. (Tr. 105).

In a disability appeals reported dated January 24, 2008, Headla reported that there had been a change in his condition since his last report, citing "severe and continued back pain since 2001." (Tr. 110). He reported no new limitations, although he noted difficulty in caring for his personal needs "due to pain." (Tr. 110; 113).

### 2. *Plaintiff's Testimony*

At the hearing, Headla testified that at the time of his alleged onset date, he was divorced, and living alone in a mobile home. (Tr. 31). He testified that he drove, but not very much due to the pain in his back. (*Id.*). Headla testified that his condition was the result of a workplace injury sometime in early 2002, when a wall he was raising at work (he was a carpenter) tipped over, pushing him off a deck and down twelve to twenty feet to the ground, where he landed on his feet. (Tr. 32). He testified that he was not hospitalized after the accident, nor did he seek other treatment. (Tr. 32-33). He testified that he believed at first that he could just work through the pain, but after about six or seven months of work, "the pain got to the point where I couldn't take it no more, I couldn't get out of bed in the morning, and I was missing a lot of work." (Tr. 33). He also testified that he did not take any medication for the pain because he did not have

insurance. (Tr. 34).[3] Headla testified that he performed light chores, including vacuuming and some grocery shopping, but that he did not do much due to the pain. (Tr. 33).[4] He testified that he had difficulty walking due to tingling and numbness in his leg. He testified that during the time period in question, he would have been able to walk for about twenty to thirty minutes, stand for about an hour and sit for about an hour before needing to change position. (Tr. 36). He testified that if he had to guess how much he could have lifted during that time period, he would say less than fifty pounds. (Tr. 35).

### 3. Medical Evidence

The majority of the medical records in the file post-date the time period in question in this case – September 1, 2002 through December 31, 2002.[5] The only records covering that time period are a few chiropractic care records, which begin on December 17, 2002. Thus, the court will discuss the other treating records in the file only to the extent they shed light on Headla's condition during the time period at issue here. *King v. Sec'y of Health & Human Servs.*, 896 F2d. 204, 205-06 (6th Cir. 1990).

### a. Treating Sources

### i. Chiropractor

Headla's first treatment records are from a chiropractor, Dr. Donald Towers, beginning on December 17, 2002. (Tr. 123-24). In his initial forms, Headla reported that he had previously

---

[3] Headla testified that he began taking medication for his condition in 2006, when he had his first surgery on his back. (Tr. 34). He had a second surgery in 2007. (*Id.*).

[4] Headla testified that he moved in with his mother in approximately 2003. (Tr. 33).

[5] For applications concerning disability insurance benefits, "the only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). *See also* Tr. 95 (listing alleged onset date of September 1, 2002 and date last insured of December 31, 2002).

been to an after-hours clinic for his pain and had been prescribed muscle relaxers, but treatment records from such a visit are not in the file.[6] (Tr. 128). Headla reported headaches, ringing in his ears, neck, mid-back, lower back and hip pain, and sleeping problems. (Tr. 129). Upon examination, Dr. Towers noted tenderness and spasms in Headla's lumbar and cervical spine, with less than normal flexation in both areas. (Tr. 123-24). He had positive Schepelmann's and Kemp's signs, as well as positive Nachlas', Ely's, Soto-Hall, Lasegue's, Braggard's and bilateral leg raising and lowering tests. (*Id.*). Dr. Towers noted edema in Headla's cervical, thoracic and lumbar spine, and muscle spasms in his thoracic and lumbar spine. (Tr. 142). Headla was diagnosed with major subluxation complex of his lumbar spine, with muscle spasms, myofascitis, swelling and radiculopathy. (*Id.*). He was also diagnosed with subluxation complex of his T12 and C4 spine, with muscle spasms, myofascitis and radiculopathy. (*Id.*). Dr. Towers placed him on temporary disability for one month, but found him "redeemable with treatment." (*Id.*). Dr. Towers treated Headla six additional times between December 18, 2002 and December 31, 2002. (Tr. 140). However, besides notations on a spinal manipulation chart, there are no additional treatment records for this period. (*Id.*).

In a letter to Headla's counsel, dated February 7, 2003, Dr. Towers stated that Headla's condition stemmed from a workplace accident in 2001.[7] (Tr. 116). He stated that Headla's

---

[6] This also conflicts with Headla's hearing testimony that he neither saw a doctor previously for his condition, nor took any pain medication. (Tr. 33-34).

[7] The exact date of Headla's injury is uncertain, as it is different in almost every record in the file. For instance, in a June 2005 letter, Dr. Towers stated that the injury took place in September 2002, despite the fact that in his first letter he stated it was in 2001. (Tr. 117). Other records are similarly confusing: On an intake form for a neurosurgical consultation with Dr. Mark Adams, Headla listed his injury date as January 10, 2002 (Tr. 151); Dr. Adams noted on treatment records that the accident occurred in 2000 (Tr. 168). Another neurosurgeon Dr. Diaz, documented that the injury occurred in early 2000 as well. (Tr. 253). Another one of Headla's treating doctors, Dr. Sperl, noted that the date of injury was September 2, 2002. (Tr. 184). The same doctor later noted the date of injury as "the early part of 2002." (Tr. 202).

minimal improvement under care led him to suspect a lumbar disc herniation, and he intended to send him for an MRI. (*Id.*). Dr. Towers stated that Headla would be unable to work until at least spring 2003, pending the outcome of the MRI. (*Id.*).

At an appointment on March 24, 2003, Dr. Towers noted that Headla's pain was "persisting with exacerbations." (Tr. 119). Headla continued to have positive results in a number of functional tests, and severely decreased range of motion accompanied by pain in his lumbar spine. (Tr. 120). Dr. Towers recommended a course of manipulations one to three times a week for twelve to sixteen weeks and his prognosis was "guarded." (*Id.*). At an appointment on June 28, 2004, Headla again showed positive results on a number of function tests. (Tr. 121-22). However, his range of motion in both his cervical and lumbar spine had greatly increased, with many scores above normal. (*Id.*). Despite this progress, Dr. Towers noted that Headla's pain had increased, and that treatment of his other doctors, including "shots," was not helping. (Tr. 126). Dr. Towers again prescribed manipulation one to three times a week for fourteen to eighteen weeks and his prognosis of Headla was "guarded." (*Id.*). He did not render any temporary disability recommendations.

On July 30, 2003, Dr. Towers recommended a neurosurgical consultation for Headla with a Dr. Palavali. (Tr. 118). The results of that consultation are not in the file. In a letter, dated June 2, 2005, Dr. Towers noted that after two to three years of treatment, and based on the findings of Headla's MRI, he was suggesting a neurosurgical consultation with a Dr. Avery Jackson. (Tr. 117). The results of that consultation are also not in the file.

ii. *MRIs*

There are a number of MRI results in the record, none of which occurred during the time period in question. The first is dated July 2003. (Tr. 146). At the time, Headla reported chronic

6

back pain radiating into both legs, with paresthesias in both legs as well. (*Id.*). The MRI, which solely covered Headla's lumbar spine, revealed "no normal alignment of vertebral segments," and minimal desiccation changes at L3-L4, L4-L5 and L5-S1. (*Id.*). It documented that the "bone marrow signal is normal throughout," and that "[t]here are no intrathecal abnormalities." (*Id.*). It also documented a "[l]eft paracentral disc herniation of the extrusion type" at L5-S1 that was "in contact with both S1 nerve roots and displacing the left S1 nerve root posterolaterally." (*Id.*). In addition, Headla had a broad-based disc bulge at L4-L5 with "facet arthropathy and ligamentum flavum laxity producing bilateral neural foramen narrowing," as well as "[m]ultilevel facet arthropathy," throughout the rest of his lumbar spine. (*Id.*).

A second MRI, conducted on November 16, 2004, documented "a posterior annular tear, with a small posterior central and left paracentral disc protrusion and mild compression of the thecal sac" at L5-S1, but otherwise no evidence of herniation in the lumbar spine. (Tr. 145). It did note some disc degeneration in T11-T12, but without focal disc herniation. (*Id.*). A third MRI, conducted on March 2, 2006, noted again "mild left paramedian and central herniation of disc with acute rupture of the annulus at L5-S1." (Tr. 144). It also noted mild facet hypertropic degenerative changes at L5-S1 and, to a lesser extent, at L4-L5. (*Id.*). The remainder of the lumbar spine appeared unchanged. (*Id.*). The remainder of the MRIs and other images in the file are either post-surgery, or focus on other areas of Headla's spine, including his thoracic and cervical spine. (Tr. 169-75; 178-81; 206-10).

### iii. *Neurosurgery*

Headla was seen by Dr. Mark Adams for a neurosurgical consultation on March 23, 2006. (Tr. 162; 168). Dr. Adams noted that since his injury, Headla "has had an aggressive conservative treatment course including physical therapy and injections," but that "[i]n spite of

this, he is having no improvement in his symptoms. In fact, his pain is getting worse and it is incapacitating him to the point where he is unable to even hunt." (*Id.*). Dr. Adams conducted motor testing of Headla's legs, finding "weakness in his gastrocnemius worse on the left than the right." (*Id.*). In addition, Headla had positive straight leg raising tests, positive muscle spasms, "absent ankle jerk reflex and decreased sensation in an S1 distribution." (*Id.*). Dr. Adams concluded that a posterior lumbar fusion was the best course for Headla, and he agreed. (*Id.*). The rest of Dr. Adams treatment notes deal with Headla's condition post-surgery, and reveal that the surgery did not fully succeed in correcting his pain. (Tr. 163-67; 171-72; 174-81; 258). In addition, Headla began experiencing problems with his cervical and thoracic vertebrae, including disc herniations at C5-C6; C6-C7 and diffuse disc protrusions at T3-T4, T7-T8 and T10-T11. (Tr. 169-70; 173; 259-60).

*iv.*     *Dr. Sperl*

On November 11, 2004, Headla began treatment with Dr. Michael Sperl, M.D. (Tr. 202) In Dr. Sperl's letter of that date to the Accident Fund Insurance Company of America, he wrote that Headla reported that he stopped working in September 2002 because of pain in his back and left leg due to his workplace accident in early 2002. (Tr. 202). He reported having been previously treated by a Dr. Boike and having undergone both MRI testing and physical therapy. (Tr. 203). However neither Dr. Boike's records nor any physical therapy records preceding this date are in the file. Dr. Sperl noted that Headla attended the appointment by himself, and that although he had a "somewhat gelled" gait, he did not use a walking aid. (*Id.*). Dr. Sperl noted that Headla was able to sit, stand, dress and undress independently. (*Id.*). Upon examination, Dr. Sperl noted that Headla's range of motion in his lower back was no more than one-third of normal. (Tr. 204). However, his range of motion in his legs was intact, with a sitting straight leg

raising test of 65 degrees bilaterally with left side discomfort, symmetric reflexes, intact strength and no visible atrophy or fasciculations. (*Id.*). Dr. Sperl noted that "[t]he relationship between [Headla's] complaints and this work event revolves around the accuracy of the history itself." (*Id.*). He deferred a diagnosis or the imposition of work restrictions pending a new MRI. (Tr. 204-205).

The MRI was conducted on November 16, 2004, and Dr. Sperl then wrote a second letter one week later noting that there had been "a relative improvement" in Headla's condition as compared to his July 2003 MRI. (Tr. 199-201). Dr. Sperl opined that Headla's condition was "mechanical in nature." (Tr. 200). Though Dr. Sperl found Headla had "not yet fully recovered," he indicated that further treatment "should be conservative in nature. The patient is not a surgical candidate." (*Id.*). Dr. Sperl then imposed work restrictions on Headla, including no "repetitive bending, twisting, as well as lifting of weights no greater than 25 pounds with repetition implying a frequency of no greater than six to ten times per hour." (*Id.*).

Dr. Sperl did not treat Headla again until December 2008, after his lumbar fusion surgery. (Tr. 190-93). At that time, he documented that Headla had not made much improvement in the intervening four years, despite having undergone surgery in 2006 and 2007. (*Id.*). Dr. Sperl determined that Headla had reached his maximum medical improvement, and any further treatment should be conservative in nature. (Tr. 192). He continued to issue the same work restrictions he had issued in 2004, which, in a later letter, he characterized as "light duty." (*Id.*; Tr. 188). In a January 2009 letter, Dr. Sperl noted that Headla was complaining of issues with his cervical spine, but that Dr. Sperl only had cervical MRI results from 2007, and thus he was unable to objectively link any cervical spine issues to Headla's workplace injury,

and could only rely on Headla's subjective history. (Tr. 186-87).[8]

In a functional capacity assessment dated "4/31/09", Dr. Sperl modified his earlier-issued work restrictions. (Tr. 257). He found that Headla could only lift or carry a maximum of ten pounds frequently, could stand or walk less than two hours, had to alternate between sitting and standing, had mild restrictions in pushing and pulling and was limited in bending or twisting. (*Id.*). Dr. Sperl opined that these limitations had existed since March 2002, and that the restrictions would disrupt Headla's work schedule fifty percent of the time, even at a job with low physical demands. (*Id.*). Dr. Sperl did not give justifications for his new work restrictions or state the findings upon which those restrictions were based. Dr. Sperl's most recent treatment records from April 2, 2009 did indicate that Headla's condition had worsened (he noted that he was at 33% of normal with regard to range of motion, whereas in December 2008 he had been at between 33% and 50%), but there were no notes relating to Dr. Sperl's finding that the restrictions he imposed would have been applicable back in March 2002. (Tr. 261-63; 191).

### b. Consultative and Non-Examining Sources

Prior to his surgery, on October 5, 2005, Headla was seen by Dr. Fernando Diaz, a neurosurgeon, for an independent evaluation. (Tr. 253-56). Headla reported that his pain began at the time of his injury – listed in this report as having occurred in "early 2000," but that it was initially mild. (Tr. 253). It increased over six or seven months to the point where he could not work any longer and he had not worked since. (*Id.*). Headla reported that tingling and numbness in his left thigh began in 2001, and had increased in the last six months before the consultation. (*Id.*). Headla reported that his pain increased with prolonged sitting, standing, walking, bending or activity and prevented him from being able to participate in any activity. (*Id.*). Headla

---

[8] Page 2 of this letter appears to be missing from the record.

reported taking analgesics for his pain. (Tr. 254). Upon examination, Dr. Diaz noted a full range of motion in Headla's lower extremities, with strength of 5/5 bilaterally in all muscle groups. (Tr. 255-56). He noted that Headla ambulated with a slightly antalgic gait, and was unable to heel or toe walk due to pain. (Tr. 256). He also noted a slightly decreased left ankle reflex. (*Id.*). Dr. Diaz noted a negative Roberg test, no appreciable palmomental reflex, and negative seated straight leg raising test. (*Id.*). Upon reviewing Headla's 2004 MRI, Dr. Diaz concluded that Headla had a herniated disc at L5-S1, "which is the direct result of his work related injury of February of 2000." (*Id.*). He went on to opine, "I believe this man suffered an initial annular tear at the time of the injury, which slowly progressed to evolve into a subligamentous disc herniation that is causing nerve root compression." (*Id.*). Dr. Diaz concluded "the injuries [Headla] claims are all related to the work related event." (*Id.*).

### 4. *Vocational Expert's Testimony*

VE Judith Findora testified that Headla's past work was as a rough carpenter, which was heavy and skilled work. (Tr. 39). Neither the ALJ nor Headla's counsel asked any additional questions of the VE. (*Id.*).

## C. Framework for Disability Determinations

For applications concerning disability insurance benefits, "the only necessary inquiry is whether the claimant was disabled prior to the expiration of his insured status." *Key*, 109 F.3d at 274. This is because a "'period of disability' can commence only while an applicant is fully insured. *Jones v. Comm'r of Social Security*, 121 F.3d 708 (6th Cir. 1997) (citing 42 U.S.C. § 416(i)(2)(C)). *See also Hamilton v. Apfel*, 178 F.3d 1294 (6th Cir. 1999) (citing *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990)); 42 U.S.C. § 423(a), (c) and (d). Accordingly, a claimant who fails to prove he was suffering from a disability *while insured* does not become

11

entitled to disability insurance benefits if he becomes disabled *after* his insured status expires. *Id.* This does not mean, however, that evidence post-dating the claimant's date last insured is irrelevant to the disability determination. Rather, while the ALJ generally only considers evidence from the alleged disability onset date through the date last insured, he may also consider later evidence to the extent it relates back to the claimant's condition during the relevant period. *King*, 896 F.2d at 205-06.

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Headla had not met the "very difficult burden" of proving that he was disabled during the time period between September 1, 2002 and December 31, 2002. (Tr 15). At Step One, the ALJ determined that Headla had not engaged in substantial gainful activity from September 1, 2002 through his date last insured. (Tr. 14). At Step Two, the ALJ found that Headla had the severe impairment of degenerative disc disease. (*Id.*). At Step Three, the ALJ found that Headla's severe impairment did not meet or medically equal a listed impairment. (*Id.*). The ALJ then assessed Headla's residual functional capacity, finding that Headla was capable of performing the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (*Id.*). At Step Four the ALJ determined that Headla could not perform his past relevant work, which was heavy in nature. (Tr. 16). At Step Five, the ALJ concluded that, based on application of the Medical-Vocational Guidelines, Headla was capable of performing a significant number of jobs in the national economy and thus he was not disabled. (Tr. 16-17).

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the

Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can

consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Headla argues that Dr. Towers's determination, in December 2002, to place him on temporary disability for a month, and then renew that finding in February 2003 until the spring is evidence that Headla was disabled during the time period in question and thus a finding of not disabled was error. Headla further argues that the ALJ erred in the weight he gave to treating doctor Sperl's 2009 functional capacity assessment. Based on that assessment, which included nonexertional limitations, Headla argues that the ALJ was not entitled to rely on the Medical-Vocational Guidelines to render a conclusion of not disabled, but should have been required to elicit testimony from a VE regarding the number of jobs available to him. The court will consider Headla's arguments in turn.

> *1.    The ALJ Did Not Err In Finding No Disability Despite a Chiropractor Placing Headla On Temporary Disability in December 2002.*

Headla argues that Dr. Towers's decision to place him on temporary disability in December 2002, and again until the spring of 2003, is presumptive evidence that he was disabled during the time period in question. The court disagrees.

As outlined above, in order for a claimant to be disabled under the Act, the alleged disability must be expected to last for at least twelve months. 42 U.S.C. §§ 423(d)(1)(A). Here, Dr. Towers first opined that Headla would be disabled for only one month (from December 17,

2002 through January 17, 2003), and would be "redeemable with treatment." (Tr. 142). In his February 7, 2003 letter, Dr. Towers believed that Headla would be disabled only "until the spring of [2003]," pending the outcome of an MRI. (Tr. 116). There are no further records from Dr. Towers opining about Headla's disability status after this date. Thus, this evidence, even in the face of the ALJ's somewhat ambiguous statement that "[t]he records after December 31, 2002, reflect no discernable change," (Tr. 15), does not support the conclusion that Dr. Towers found Headla disabled for longer than the few months between December 17, 2002 and spring 2003, or that Headla was, in fact, disabled for the requisite period of time.

Second, it is unclear from Dr. Towers's finding whether his temporary disability recommendation was intended to apply to all occupations or only as to Headla's then-work as a carpenter. (*See* Tr. 128 (Headla describing "specific job duties" as a carpenter and work place injury on Towers Chiropractic Workman's Compensation Form)). In addition, in his decision, the ALJ cited Headla's testimony that during the period in question he lived alone and performed various activities of daily living, and estimated that he would have been able to lift less than 50 pounds, and was able to walk for twenty minutes, and stand or sit for about an hour each before needing a break, activities inconsistent with total disability. (Tr. 16, 35-36). Furthermore, when Dr. Sperl first examined Headla in 2004, and again in 2008, he assessed light duty work restrictions upon him. (Tr. 188; 192; 200). And, as outlined further below, Dr. Sperl's more limiting 2009 restrictions, which he opined applied back to March 2002, contradict his earlier assessment, and are not supported by the record. (Tr. 257). Because the record is devoid of evidence that Headla was totally disabled during the time period in question, and because substantial evidence supports the ALJ's contrary conclusion, the ALJ did not err in the weight he gave to Dr. Towers's temporary disability opinion.

2. *The ALJ did not err in relying on the Medical-Vocational Guidelines to Render a Determination of Not Disabled*

Headla argues that the ALJ erred in the weight he gave to Dr. Sperl's 2009 functional capacity assessment that, if properly weighted, would have prevented the ALJ's reliance on the Medical-Vocational Guidelines in determining whether there were a significant number of jobs in the national economy that he could perform. Headla points specifically to the limitation in Dr. Sperl's 2009 assessment requiring a sit/stand option, and to the portion in which Dr. Sperl opines that these restrictions would have applied as early as March 2002. These arguments fail.

As stated above, once an ALJ determines that a claimant cannot return to his or her past relevant work, the burden shifts to the Commissioner to show that, based on the claimant's age, education, work experience, and RFC, a significant amount of other work exists in the national economy that the claimant can perform. In making this determination, an ALJ may, occasionally, rely on the Medical-Vocational Guidelines, otherwise known as "the grids." *Ziegler v. Sullivan*, 894 F. 2d 1337 (6th Cir. 1990); *Moon v. Sullivan*, 923 F.2d at 1181. However, the grids only directly apply to exertional limitations, and reliance on the grids is generally inappropriate where the claimant also has nonexertional limitations. *Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 282 (6th Cir. 1985); *Abbott v. Sullivan*, 905 F. 2d 918, 927 (6th Cir. 1990); 20 C.F.R. § 416.969a(c)(2). If an ALJ seeks to use the grids in the face of a nonexertional limitation, he or she must find that the impairment does not significantly reduce the occupational base of work at the exertional level the ALJ has found appropriate. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528-29 (6th Cir. 1981).

Here, the ALJ found that Headla did not suffer from any nonexertional impairments, and thus relied on the grids to render a finding of not disabled. Headla argues that he did have nonexertional limitations during the period at issue, namely the need for a sit-stand option and

limited twisting and bending, which were outlined in Dr. Sperl's 2009 restrictions. Thus, the first issue the court must address is whether the ALJ properly weighted Dr. Sperl's 2009 opinion.

A treating physician's opinion is entitled to controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Id.*, *citing Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. Under these standards, it is clear that the ALJ did not err in the weight he gave to Dr. Sperl's 2009 opinion.

First, evidence from outside the relevant time period, including treating physician opinion evidence, is only "minimally probative" of a claimant's condition during the period in question. *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987) (treating physician opinion rendered eight months after expiration of insured status was minimally probative where claimant suffered from degenerative disorders); *see also Swain v. Comm'r of Soc. Sec.* , 379 Fed. Appx. 512, 517 (6th Cir. 2010) (Sixth Circuit "has held that a treating physician's opinion is minimally probative when the physician began treatment after the expiration of the claimant's

insured status.").  Just as in *Siterlet*, Headla here suffers from a degenerative disorder, one which Dr. Sperl did not begin treating until almost two years after the expiration of Headla's insured status.  (Tr. 199-205); s*ee Siterlet*, 823 F.2d at 920.  Furthermore, the only evidence upon which Dr. Sperl relied that predates his own treatment of Headla was a July 2003 MRI, also conducted outside of the relevant time period.  (Tr. 200).  In his 2004 opinion, Dr. Sperl himself noted that "the relationship between [Headla's] complaints and this work event revolves around the accuracy of the history itself," thus confirming that he did not have the objective medical evidence to render an opinion about the cause of Headla's pain in 2004.  (Tr. 204-205).  Therefore, Dr. Sperl's 2009 opinion was only minimally probative of Headla's functional capacity during the relevant time period, and the ALJ did not err in the weight he gave it.

Second, the ALJ gave good reasons for rejecting Dr. Sperl's 2009 assessment of Headla's limitations during the relevant period.  Besides noting that Dr. Sperl had not treated Headla during the period in question, the ALJ found that Dr. Sperl's earlier workplace limitations (the ones issued in closer proximity to the time period in question) were consistent with sedentary exertion.  (Tr. 15).  Indeed, Dr. Sperl characterized Headla's limitations as "light duty."  (Tr. 188).  As noted by the Commissioner, sedentary work involves lifting no more than 10 pounds, and postural limitations such occasional stooping only minimally erode the base of sedentary work and thus do not render the grids inapplicable.  *See* 20 C.F.R. § 404.1567(a); SSR 96-9p, 1996 SSR LEXIS 6 at *21, 1996 WL 374185 at *8.  Notably, neither Dr. Sperl's 2004 limitations nor his 2008 limitations required a sit/stand option.  (Tr. 192; 200).

Finally, the court notes that Dr. Sperl gave no explanation or justification for the restrictions he placed upon Headla in 2009, and why they applied as far back as March 2002.  As he was not treating Headla during the period in question, and as the earliest medical evidence

that he reviewed was a 2003 MRI, other than Headla's subjective historical recounting, Dr. Sperl did not have any objective medical data upon which to render his conclusions regarding a time period for which he was not a treating physician. (Tr. 200). Furthermore, Headla himself testified that he continued to work as a carpenter until September 2002, a heavy exertion job, as well as live alone and tend to household chores. (Tr. 33). Headla also testified that he did not seek any medical treatment prior to December 2002 – emergency or routine, nor did he take any medication for his pain during this time. (Tr. 32-33). This testimony undercuts Dr. Sperl's assessment that Headla could only lift ten pounds, required a sit/stand option and could not repeatedly bend or twist, or push or pull since March 2002. While Headla testified that his lack of medical treatment was because he was not insured at the time, it was well within the ALJ's province to discount this testimony. *See Rice v. Astrue*, No. 11-102, 2012 U.S. Dist. LEXIS 4041 at *9-10, 2012 WL 95433, (S.D. Ohio Jan 12, 2012) (finding that claimant's lack of medical treatment inconsistent with allegations of disabling pain even where claimant testified that lack of treatment was due to financial constraints); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (ALJ's credibility determination should be accorded great weight and deference). For all these reasons, the court finds that the ALJ did not err in rejecting Dr. Sperl's assessment "to the extent that it is meant to apply to the period on or before December 31, 2002." (Tr. 15).

Because substantial evidence supports the ALJ's assessment that Headla could perform the full range of sedentary work without nonexertional limitations, he properly applied the Medical-Vocational Guidelines to determine that Headla was not disabled from September 1, 2002 until December 31, 2002.

### III. CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Headla's Motion for Summary Judgment [7] be DENIED, the Commissioner's Motion be GRANTED [10] and this case be AFFIRMED.


Dated: April 4, 2012                          s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge


### NOTICE REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 4, 2012.

                                              s/Felicia M. Moses
                                              FELICIA M. MOSES
                                              Case Manager